# EXHIBIT A

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Northern California

International Refugee Assistance Project

muslim advocates
PROMOTING FREEDOM & JUSTICE FOR ALL

February 25, 2019

**Via Certified Mail, Return Receipt Requested**

**U.S. Department of Homeland Security**
Dr. James V.M.L. Holzer
Deputy Chief FOIA Officer
The Privacy Office
245 Murray Lane SW
STOP-0655
Washington, DC 20528-0655

**Federal Bureau of Investigation**
David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
170 Marcel Drive
Winchester, VA 22602-4843

**U.S. Department of State**
FOIA Officer
Office of Information Programs and Services
A/GIS/IPS/RL
SA-2, Suite 8100
Washington, DC 20522-0208

**U.S. Department of Justice**
Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
Suite 11050
1425 New York Avenue, N.W.
Washington, DC 20530-0001

**Re: Request Under Freedom of Information Act**

To Whom It May Concern:

The American Civil Liberties Union of Northern California (including the ACLU Foundation of Northern California) ("ACLU-NC"), Muslim Advocates, and the

International Refugee Assistance Project ("IRAP") (collectively "Requestors") submit this Freedom of Information Act ("FOIA") request for information pertaining to the surveillance and criminal investigation of refugees in the United States of America.

We submit this request because of our concern over the Trump Administration's antagonism towards refugees, which has been apparent in its repeated attempts to ban refugee admission to the United States. In President Trump's first week in office he signed Executive Order 13769 ("EO-1"), which suspended the U.S. Refugee Admissions Program ("USRAP") for 120 days, indefinitely barred Syrian refugees, and attempted to slash the refugee admissions cap in Fiscal Year ("FY") 2017 from 110,000 to 50,000. Following legal challenges, the Administration replaced EO-1 with Executive Order 13780 ("EO-2") that, among other things, again suspended all refugee admissions for 120 days. At the close of EO-2's 120-day refugee ban, the Administration's agencies issued a memorandum imposing yet another 90-day ban on refugees from eleven countries, nine of which are reported to be Muslim-majority, and indefinitely suspending processing and admission for all Follow-to-Join refugees. All of our organizations have been involved in various court challenges to this most recent refugee ban.

The Administration's actions, including President Trump's announcements of historically low caps on refugee admissions, have severely constricted refugee admissions. After attempting to lower the refugee admissions cap through the Executive Orders, the President capped refugee admissions at 45,000 for FY 2018 and 30,000 for FY 2019. The number of refugees admitted under the Trump Administration has plummeted – and disproportionately so for Muslim refugees.[1]

There is no doubt that this drop in refugee admissions has been driven by the Administration's virulent anti-refugee sentiment, beginning with President Trump's campaign promise to ban refugees and Muslims. This rhetoric frequently portrays refugees as threats to national security. For example, then-Attorney General Jeff Sessions claimed on March 6, 2017 that "more than 300 people, according to the FBI, who came here as refugees are under an FBI investigation today for potential terrorism-related activities."[2]

This request seeks policies, communications, and data about the surveillance and criminal investigation of refugees in the United States under the Trump Administration. We seek to understand the pernicious effects of government surveillance and investigation on refugee communities.

---

[1] *See, e.g.*, https://www.npr.org/2018/12/27/680308538/2018-was-a-year-of-drastic-cuts-to-u-s-refugee-admissions; https://www.newyorker.com/news/daily-comment/the-trump-administrations-hard-line-on-refugees-comes-under-fire.

[2] *See* https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-revised-executive-order-protecting-nation.

## Definitions

For purposes of this request, the following terms are defined as follows:

Assessment: The term "assessment" has the meaning used in the *Attorney General's Guidelines for Domestic FBI Operations.*[3]

Communications: The term "communications" includes, but is not limited to: e-mails; text communications between phones or other electronic devices (including but not limited to, communications sent via SMS or other text, Blackberry Messenger, iMessage, WhatsApp, Signal, Gchat, or Twitter direct message); images, video, and audio recorded on cell phones; voicemail messages; social-media posts; formal and informal presentations; alerts; bulletins; advisories; and minutes or notes of meetings and phone calls.

Criminal Investigation: The term "criminal investigation" includes any assessment, predicated investigation, preliminary investigation, or full investigation as described in *Attorney General's Guidelines for Domestic FBI Operations*, or any other similar investigation carried out by a Subject Agency other than the FBI which could lead to the filing of criminal charges in federal court.

Full Investigation: The term "full investigation" has the meaning used in the *Attorney General's Guidelines for Domestic FBI Operations.*

Preliminary Investigation: The term "preliminary investigation" has the meaning used in the *Attorney General's Guidelines for Domestic FBI Operations.*

Records: The term "records" includes, but is not limited to:, legal memoranda, procedures, policies, directives, practices, reports, audits, guidance, or guidelines that were prepared, received, transmitted, collected, and/or maintained by Subject Agency.

Refugee: The term "refugee" means any person who was or has been admitted to the United States through the U.S. Refugee Admissions Program, including as a beneficiary of a I-730 petition, whether or not they have since adjusted to become Lawful Permanent Resident or U.S. citizen.

Subject Agency: The term "Subject Agency" includes the Department of Homeland Security, the Department of Justice, the Federal Bureau of Investigation, and the Department of State, as well as any sub-component or sub-agency of those departments.

Surveillance: The term "surveillance" includes the surveillance methods contemplated by the *FBI's Domestic Investigation and Operations Guide*,[4] similar surveillance methods used by any

---

[3] Available at https://www.justice.gov/archive/opa/docs/guidelines.pdf.

other Subject Agency, and any other method used to collect information, including human intelligence gathering and electronic surveillance of communications devices.

White House: The term "White House" includes, but is not limited to, the Executive Office of the President, the Office of the President, the White House Office, the Office of Counsel to the President, the National Security Council, the Office of the Vice President, the Cabinet, as well as any government officer who directly advises the President or the Vice President as to the legality of, or authority to undertake, any executive action.

## Relevant Time Frame

This request seeks Records that have been created or have been effective on or after January 19, 2017. This request also seeks Communications that occurred on or after January 19, 2017.

## Requests

1. Any and all records pertaining to the criminal investigation of a refugee or refugees residing in the United States.

2. Any and all communications to, from, or within any Subject Agency, including between the White House and any Subject Agency, pertaining to the criminal investigation of a refugee or refugees residing in the United States.

3. Any and all records pertaining to FBI intelligence gathering about refugees residing in the United States through:

   a. "outreach" to mosques and Muslim communities or individuals.[5]
   b. "Domain Management."[6]
   c. the Nationwide Suspicious Activity Reporting (SAR) Initiative;[7]

4. Any and all records pertaining to then-Attorney General Jeff Sessions' claim on March 6, 2017 that "today, more than 300 people, according to the FBI, who came

---

[4] *See* https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29%202016%20Version.

[5] *See* https://www.aclu.org/other/aclu-eye-fbi-alert-mosque-outreach-intelligence-gathering?redirect=FBI-mosque-outreach.

[6] *See* https://www.aclu.org/blog/national-security/privacy-and-surveillance/axe-wasteful-and-abusive-fbi-programs.

[7] *See* https://nsi.ncirc.gov/default.aspx.

here as refugees are under an FBI investigation today for potential terrorism-related activities."[8]

5. Any and all communications to, from, or within any Subject Agency, including between the White House and any Subject Agency, pertaining to then-Attorney General Jeff Sessions' claim on March 6, 2017 that "today, more than 300 people, according to the FBI, who came here as refugees are under an FBI investigation today for potential terrorism-related activities."

6. Data sufficient to show, from January 19, 2017 to the present, on a monthly basis and broken down by nationality, the following with respect to the Federal Bureau of Investigation:

    a. the number of suspicious activity reports received pertaining to refugees through the Nationwide SAR Initiative;
    b. the number of assessments of refugees that were opened;
    c. the number of assessments of refugees that were closed without federal criminal charges being filed;
    d. the number of preliminary investigations of refugees opened;
    e. the number of preliminary investigations of refugees closed without federal criminal charges being filed;
    f. the number of full investigations of refugees opened; and
    g. the number of full investigations of refugees closed without federal criminal charges being filed.

7. Any and all records pertaining to the surveillance of a refugee or refugees residing in the United States.

8. Any and all communications to, from, or within any Subject Agency, including between the White House and any Subject Agency, pertaining to the surveillance of a refugee or refugees residing in the United States.

9. Any and all records pertaining to how surveillance or criminal investigation of a refugee residing in the United States affects their application for adjustment of status or citizenship, including any and all communications between the investigating or surveilling agency and USCIS, DOS, and/or ICE.

---

[8] U.S. Dep't of Justice, "Attorney General Jeff Sessions Delivers Remarks on Revised Executive Order Protecting the Nation from Foreign Terrorist Entry" (March 6, 2017), available at https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-revised-executive-order-protecting-nation.

10. Any and all records pertaining to how surveillance or criminal investigation of a refugee residing in the United States affects the immigration application for refugee status, adjustment of status, or citizenship of any person who lists such refugee as a contact, a sponsor, or a family member on the application, including any and all communications between the investigating or surveilling agency and USCIS, DOS, and/or ICE.

11. Any and all records pertaining to recruitment of refugees to act as informants or gather intelligence for the FBI.

12. Any and all records provided by the Department of Homeland Security or the Department of State to the Senate Judiciary Committee in response to a letter dated August 20, 2018 from Sen. Chuck Grassley.[9]

**"Public Interest" Fee Waiver Request**

We request a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest because disclosure is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(iii); 28 C.F.R. § 16.11(k)(1); 6 C.F.R. § 5.11(k); 22 C.F.R. § 171.16.

The records sought here will significantly contribute to public understanding of the government's criminal investigation and surveillance of refugees living in the United States at a time when the U.S. government has adopted a radical shift in refugee policy. *See* 28 C.F.R. § 16.11(k)(1)(i); 6 C.F.R. § 5.11(k). Very little is currently known about how the authorities are approaching the criminal investigation and surveillance of refugees, including whether political pressure has been brought to bear on the agencies responsible for these activities. Release of the records requested will shed much-needed light on these troubling practices.

The Requestors plan to disseminate widely to the public records disclosed as a result of this FOIA request. The Requestors routinely obtain information about government activity (including through FOIA), analyze that information, and widely publish and disseminate that information to the press and to the public in a variety of ways including the following:

The ACLU-NC's communications department is a division of a nonprofit 501(c)(3) organization and is a "representative of the news media." The ACLU-NC's communications department publishes newsletters, news briefings, right-to-know documents, and other

---

[9] Letter from Sen. Grassley to DHS Secretary Nielsen and State Department Secretary Pompeo (August 20, 2018), available at https://www.judiciary.senate.gov/imo/media/doc/2018-08-20%20CEG%20to%20DHS%20+%20State%20(Ameen%20refugee%20records).pdf.

materials that are disseminated to the public. Its material is widely available to everyone, including tax-exempt organizations, not-for-profit groups, law students and faculty, for no cost or for a nominal fee. The ACLU-NC's communications department also disseminates information through the website, http://www.aclunc.org, which averages between 10,000 and 20,000 visitors per week. This website addresses civil liberties issues in depth and provides features on civil liberties issues on which the ACLU-NC is focused. ACLU-NC staff persons are frequent spokespersons in television and print media and make frequent public presentations at meetings and events. Finally, the ACLU-NC's communications department disseminates information through a newsletter, which is distributed to over 170,000 subscribers by mail. Due to these extensive publication activities, the ACLU-NC is a "representative of the news media" under the FOIA and agency regulations.

Muslim Advocates is a national 501(c)(3) non-profit civil rights and advocacy organization that focuses on issues of particular relevance to Muslim and immigrant communities in the United States.[10] Muslim Advocates uses public advocacy and education campaigns, impact litigation, and legislation and policy work to protect and advance the civil rights of Muslim and immigrant communities. Muslim Advocates has filed dozens of FOIA requests on matters of public interest such as this one, and regularly uses the information it obtains through FOIA requests to produce know-your-rights and other educational materials, disseminate press releases and blog posts, and publish reports, articles, and opinion editorials on its website and in other outlets. Muslim Advocates also regularly disseminates information to the public through its email lists and social media outlets.

IRAP is a 501(c)(3) organization that organizes law students and lawyers to develop and enforce a set of legal and human rights for refugees and displaced persons. IRAP utilizes media and systemic policy advocacy, direct legal aid, and impact litigation to serve the world's most persecuted individuals and empower the next generation of human rights leaders. IRAP routinely gathers information through its legal and policy work, including through FOIA requests, processes the information, and distributes that work to a broad audience. IRAP has published a number of policy reports to the public on refugee resettlement issues,[11] and maintains "Know Your Rights" and other educational materials on its website.[12] It routinely releases press releases and publishes a blog on its work and on issues relating to refugee policy.[13] It has a quarterly newspaper that reaches over 25,000 individuals and a shorter newsletter that is released every 2-3 weeks.

---

[10] *See About*, Muslim Advocates, https://www.muslimadvocates.org/about/.

[11] *See, e.g.*, IRAP and Human Rights First, *Private Sponsorship of Refugee Resettlement in the United States: Guiding Principles and Recommendations* (Oct. 17, 2016) (white paper on private refugee sponsorship program), *available at* https://refugeerights.org/press-release-irap-and-human-rights-first-release-white-paper-on-private-refugee-sponsorship-program/.

[12] *See* Know Your Rights, https://refugeerights.org/know-your-rights/.

[13] *See* Press Room, https://refugeerights.org/press-room/ (last visited Sep. 8, 2017); Blog, https://refugeerights.org/blog1/ (last visited Sep. 8, 2017).

Disclosure of the requested records is not in the Requestors' commercial interest. The records requested are not sought for commercial use and the Requestors plan to disseminate the information disclosed as a result of this FOIA request to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'") (citation omitted).

**News Media Status Fee Limitation Request**

We also request a waiver of document reproduction fees on the grounds that the Requestors qualify as "representatives of the news media" and the records are not sought for commercial use. 28 C.F.R. § 16.11(d); 6 C.F.R. § 5.11(d); 22 C.F.R. § 171.16(d). The Requestors meet the statutory and regulatory definitions of a "representative of the news media" because they are "entit[ies] that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that "gathers information from a variety of sources," exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA); *Serv. Women's Action Network*, 888 F. Supp. 2d 282, 287-88 (D. Conn. 2012) (concluding that the ACLU is a news representative).[14]

Notably, courts have found other organizations whose missions, functions, publishing, and public education activities are similar in kind to the Requestors' to be "representatives of the news media." *See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA); *Nat'l Security Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. Dep't of Justice*, 133 F. Supp. 2d 52, 53-54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).[15]

---

[14] Fees associated with responding to FOIA requests are regularly waived for the ACLU, and a number of agencies have determined that the ACLU is a "representative of the news media" for the purposes of FOIA, including the Departments of Justice, State, and Commerce. In December 2008, the Department of Justice found that the ACLU was a "representative of the news media" for the purposes of FOIA in the context of a request for documents relating to the detention, interrogation, treatment, or prosecution of suspected terrorists.

[15] Courts have found these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information/public education activities. *See, e.g., Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d 5; *Nat'l Sec. Archive*, 880 F.2d at

* * *

If this request is denied in whole or in part, we ask that you justify all withholdings by reference to specific exemptions to the FOIA. We expect the release of all segregable portions of otherwise exempt material. If the fee waivers are denied, the requesters are prepared to pay fees up to $25, and request to be informed of further fees that may be charged, but reserve the right to appeal a denial of fee waivers.

Thank you for your prompt attention to this matter. Please furnish all applicable records to Sean Riordan, American Civil Liberties Union of Northern California, 39 Drumm Street, San Francisco, California 94111, telephone (415) 621-2493.

Sincerely,

Sean Riordan
Senior Staff Attorney
ACLU-NC

Sirine Shebaya
Interim Legal Director
Muslim Advocates

Mariko Hirose
Litigation Director
International Refugee Assistance Project

---

1387; *see also Judicial Watch, Inc.*, 133 F. Supp. 2d at 53-54; *see also Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (finding Leadership Conference to be primarily engaged in disseminating information even though it engages in substantial amounts of legislative advocacy beyond its publication and public education functions).